## ARCHIBALD McNEIL & SONS CO., Inc., v. UNITED STATES.

(District Court, E. D. Pennsylvania. August 1, 1924.)

No. 9860.

**1. Accord and satisfaction ⬅=17—Accord, without satisfaction, is not bar to action.**

An accord, without full satisfaction, is not a bar to an action on the original claim.

**2. Accord and satisfaction ⬅=17—Compromise and settlement ⬅=5(1)—Agreement held one of settlement, and not of accord without satisfaction.**

An agreement between the government and the owner of coal requisitioned for railroad use during federal control as to the amount to be paid therefor *held* not one of accord without satisfaction, but of settlement as to the price which would constitute just compensation, which could not be repudiated by the owner of the coal because full payment had not been made.

**3. War ⬅=14—Agreed sale price not necessarily measure of value.**

The measure of damages for the requisitioning of coal by the government for railroad use during federal control is not necessarily the price at which the owner had contracted to sell the coal in a foreign market, where, owing to conditions created by the war, there was an embargo on the export of coal, except under license, and the domestic price was also regulated by a government agency.

At law. Action by the Archibald McNeil & Sons Company, Inc., against the United States. Trial to court, and judgment for plaintiff for part of demand.

George Demming and Charles H. Burr, both of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., and Joseph L. Kun and Albert Ward, Sp. Asst. U. S. Attys., all of Philadelphia, Pa.

DICKINSON, District Judge. A ruling in this cause was deferred, awaiting the submission of briefs, which were unavoidably delayed. They have now been submitted. A jury trial was in this case waived by the parties. The facts are not in controversy, but they are unique. The question of law raised is one which arises out of these facts, and in consequence is also, in some respects, sui generis. We have thus qualified the latter statement, because the question of law in the view of the resourceful counsel for the plaintiff is one to which the familiar doctrine of the law of accord and satisfaction applies.

In logical statement the claim of the plaintiff is that coal, which was its private property, was taken by the United States for public use; that thereby a claim for just compensation arose; that the coal had been sold for export at a price which accordingly

measures this just compensation; that although it is true the plaintiff and defendant agreed upon a different price to be paid, inasmuch as this latter price had not been fully paid before the plaintiff had repudiated its agreement, there was accord, but no satisfaction, and plaintiff now has the right to recover just compensation, as if no agreement upon price had been made, the plaintiff giving credit for all sums which have been paid.

We have said the fact situation was unique. The United States was not only at war, but had entered a World War, which had been raging for several years, and which had profoundly disturbed all commercial relations and dealings, particularly affecting trading in coal, through the supply of it and demand for it. In addition to these war conditions, and growing out and as part of them, the United States had been under the necessity of taking over the operation, management, and control of the railroads of the country. Coal thus became a prime necessity. Such a thing as a market or market price for it could not exist, because the very life of the nation became dependent upon some method being introduced "to establish and maintain governmental control of such necessaries during the war." Accordingly a method was introduced by the Lever Act of August 10, 1917.[1] Full control over all dealings in coal, both with respect to prices and distribution, was given by this act to the Executive, who on August 21 and August 23, 1917, fixed coal prices by executive order and proclamation, and on the latter date the exercise of the powers conferred by the act was with respect to coal committed to the Fuel Administrator.

On September 7, 1917, the Fuel Administrator made public announcement of a general plan of price regulation and supply and distribution of coal, and followed this on October 12, 1917, with a detailed plan. The further announcement was made on January 14, 1918, that all shipments of coal should be "subject to the diversion of such coal * * * by the * * * Fuel Administrator * * * to any person or consumers and for any of the purposes theretofore or thereafter authorized." Announcements were made from time to time of the suspension and reinstatement of orders and regulations, and by executive order of October 30, 1919, the regulations affecting the prices of coal were restored "to full force and effect." Following this, on October 31, 1919, the Fuel Administrator, for administrative reasons, designated the Director General of Railroads

[1] Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e et seq.

to make "diversions of coal" for railroad consumption and private purposes, and on November 12, 1919, directed that coal shipped before November 14, 1919, under contracts entered into prior to October 30, 1919, and diverted in transit, should be paid for by the divertee at the prices which the original consignees were to have paid. Finally, by executive order of March 20, 1920, the Secretary of the Interior was "directed to adjust, liquidate, and pay all claims against the Fuel Administration."

Plaintiff was a dealer in coal, including "export coal." In the several months from October, 1919, to February, 1920 (both inclusive), coal owned by plaintiff and consigned to the Tidewater Exchange was "requisitioned and commandeered," or was "diverted" (according to the choice of phrase preferred), for public use. It is not denied that the plaintiff's title antedates October 30, 1919, and its coal was destined for export before that date.

To save an almost unending discussion of details, it answers present purposes to interpolate the comment that the task of making price adjustments, which would safeguard the public and the public treasury against raids, and at the same time have a due regard to private rights and the situation of individual shippers, was one of extreme difficulty, if not impossibility of successful accomplishment. Moreover, whenever there is a need and the power to supply that need in the hands of the necessitous, the power will at times be used. Those in the practical management of the railroads were in need of coal. Just what was needed was being transported by the needy railroad. What came to pass was that the need was supplied. Whether this taking was tortious, or under the power of eminent domain; whether it was by the Director General of Railroads, or by the Fuel Administrator, or was a forced sale to the managers of a particular railroad, was, in the phrase of Lord Dundreary, what no fellow could find out. Whatever the need of the railroads, the owner of the coal must be treated with something at least approaching fairness.

In the effort to cope with these difficulties, one method of price adjustment after another was tried and discarded, again readopted, and again abandoned. The result was the creation of a condition and situation of doubt and uncertainty, which in commercial transactions is deadening, and far worse than any one method which, however bad, is adhered to and may be relied upon as fixed and stable. As any adjustment was better than none, the Fuel Administrator and the plaintiff agreed upon the one set forth in the exchange of letters under date of May 14–15, 1920, hereinafter called the "Underwood agreement." This met the views of both parties as to what was "fair compensation." It is a little difficult for any one not familiar with such transactions, nor with the special nomenclature of the trade, nor with the official regulations, to feel sure of his analysis of the differences in results which the now opposing views of the parties present.

In order to reach the agreement of May, 1920, the claim of the plaintiff was there classified into three divisions. The first means, as we interpret it, that for all coal shipped before October 30, 1919, the plaintiff should have the price paid for it plus 15 cents. The total tonnage under this clause was 118,379.80 net tons. The cost price of the coal was paid, but the 15 cents has not been paid in full. It was paid on 55,373 net tons, and a tender was made by the railroad divertee in November, 1923, on 32,336 additional net tons, and a credit allowed the plaintiff by another railroad divertee on 6,800 net tons more. There is due the plaintiff on this item $8,431.02, made up as follows:

| | |
|---|---|
| Total tonnage............. | 118,379.80 |
| Paid tonnage..............55,373 | |
| Credited tonnage.......... 6,800 | 62,173.00 |
| Balance tonnage (at 15 cents) | 56,206.80 |

Of this balance due $4,850.40 was tendered and refused by the plaintiff, so that the real shortage in payment is reduced to $3,580.62. It would seem that the 15 cents on a further 19,084 tonnage was included in the "without prejudice" payments. This, if true, would reduce the failure to pay what was due under clause 1 of the Underwood agreement to $718.02. As against this the plaintiff is now claiming over $60,000 under clause 2 of the Underwood agreement. Coal shipped between October 30 and November 12, 1919, was to be paid for at the government price. This was in fact done; but, inasmuch as 4,290.30 net tons paid for were included in the "without prejudice" payments, the plaintiff now makes claim (as we analyze the statement of claim) to something less than $9,900.

We see no difference between the allowances in clause 3 of the Underwood agreement and the claim now made by the plaintiff, and, because of this, no occasion to analyze it. The tonnage paid for would seem to have been, however, 44,191.80 tons, but the price at which paid was $3.396, instead of $4.6562, the contract price, and 480.35

tons on which no payment was made. The total tonnage under clause 3 of the Underwood agreement is either the total tonnage with the 480.35 unpaid tonnage deducted, or there is a duplication (in part) of this item.

With the information before us we cannot give accurately a contrast between the summarized statements under the Underwood agreement and the claim now made. Approximately, hwoever, there was due the plaintiff the sum of $760,382.61, on which there was paid $698,822.10, and $8,106.01 tendered, or a total of $706,928.11, leaving a balance (without interest) of $53,453.90, or, including the tender, $61,559.91. Against this the plaintiff presents a claim (with interest) of $234,320.05.

### Discussion.

We wish first to make acknowledgment of the helpful argument addressed to us. This court has held that private property "diverted" to public use is property taken, for which the owner has the right to receive "just compensation." The proper measure of this we have not been asked to determine. It has also been held that such owner has the right to maintain an action in the District Court. These are the only points thus far ruled.

[1] The plaintiff bases its right to a judgment for the full sum claimed primarily upon the proposition that the Underwood agreement of May 14–15, 1920, is an accord and satisfaction. As such it is not binding upon the plaintiff, because it was an accord without satisfaction, the sum due thereunder not having been paid in full, and that a payment on account, no matter how substantial, or a tender of payment, avails the debtor party nothing. The industry of counsel has cited to us half a hundred cases in the United States and state courts, in addition to a number of English cases, in support of this proposition, some of which we list: Baird v. U. S., 96 U. S. 430, 24 L. Ed. 703; Chicago, M. & St. Paul R. Co. v. Clark, 178 U. S. 353, 20 Sup. Ct. 924, 44 L. Ed. 1099; Fire Ass'n v. Wickham, 141 U. S. 577, 12 Sup. Ct. 84, 35 L. Ed. 860; Brown v. Spofford, 95 U. S. 474, 24 L. Ed. 508; The Joy (D. C.) 290 Fed. 407; Wind v. England (C. C. A.) 287 Fed. 97; Cushing v. Wyman, 44 Me. 121; Sargent v. Donahue, 94 Vt. 271, 110 Atl. 442; Henderson v. McRae, 148 Mich. 324, 111 N. W. 1057; Morris v. Van Vorst, 21 N. J. Law, 100; Clifton v. Litchfield, 106 Mass. 34; Goodrich v. Stanley, 24

Conn. 613; Potter v. Kurlanger, 114 Misc. Rep. 117, 185 N. Y. Supp. 556; Meaker v. McInnes, 272 Pa. 561, 116 Atl. 400.

This long array of cases (all of which, so far as we have had access to them, we have examined), together with the English cases, so interestingly discussed by counsel, would silence any refusal to accept of the doctrine for which they stand. What is that doctrine? We adhere to the view that in one of its aspects it is the offspring of the doctrine of consideration. No one is bound to accept less than what the law pronounces to be his due, and his agreement to accept less is clearly nudum pactum. The moment, however, a consideration is introduced, he is bound. Witness cases of composition, in which a number of creditors agree with the defendant and "with each other." We accept the Siamese twin relationship between accord and satisfaction. Together they are the equivalent of payment. Accord alone is merely a promise to accept less than is due. From the viewpoint of consideration, when satisfaction is added, the transaction is in the French phrase "fait accompli." Most of the accord and satisfaction cases are viewed from the standpoint of remedial law. Accord is not a good plea in bar. Accord and satisfaction is, because it belongs to the same family as the plea of payment. Sargent v. Donahue, supra, whether well decided upon its facts or not, illustrates the distinction from the remedial viewpoint. Indeed, it illustrates also the doctrine of consideration upon which the rule with respect to accord and satisfaction rests. Mere accord is no bar to the maintenance of the original action. Both accord and satisfaction are. If, however, a new and different promise is introduced, a consideration is supplied, and the original right of action is extinguished. There is nothing gained by calling this a novation. The plaintiff has given up his former cause of action, and the stipulation into which he has entered is a bar to his assertion of what would otherwise have been his right of action.

[2] We are in full accord with the very competent counsel for plaintiff in two of the positions taken. If this agreement is one merely of accord, the plaintiff has the legal right to repudiate it, and whether it is or not must be determined by the agreement itself. We do not, however, so read it. We adhere to the illustration of an agreement upon damages in an ordinary land eminent domain case. Nor do we regard it as an analogue, but the very instant case before us,

because the instant is an eminent domain case. Nor do we regard the case of Philadelphia v. Cooper, 105 Pa. 239, upon which the plaintiff relies as a "prophetic anticipation," to be in point. Under the Constitution of Pennsylvania the power of eminent domain can be exercised only upon the condition of the payment of just compensation. If payment is not made, the owner has not parted with his title, and may be restored to possession through an action in ejectment. The cited case was one in ejectment.

The real question here is not touched in that case. If in condemnation proceedings, in consideration of the railroad paying more than it regarded as fair compensation, the damages had been stipulated at a less sum than the owner had claimed, could he have refused to accept a tender and have repudiated his agreement? If he could not, the value of the lesson taught is not destroyed by calling this a case of unliquidated damages. What it really is is holding a party to his agreement. Railway v. Swank, 105 Pa. 555, is more nearly in point. If he can truly say his agreement was without consideration, he may repudiate it, but, without this or some other means of escape from its obligation, he cannot.

This very case affords another illustration. Certain facts respecting tonnage, prices, etc., have been stipulated. Each party has made in this concessions to the other, so that ample consideration appears for the agreement made. We, in passing, commend the parties out of a grateful heart for their willingness to agree, because we have been told it would have taken months to have introduced the evidence from which the facts could have been found. Was either of the parties at liberty to repudiate this agreement merely because it chose so to do? Accounts of the general character of this are usually complicated and prone to be inaccurate, in despite of the utmost care. Had the Underwood agreement been restricted to tonnage, instead of to prices, would the parties have been held to it? Under the old system of pleading there was a declaration in general use called a declaration in the common counts. One of them averred an agreement that a sum of money had been found to be due the plaintiff by the defendant "on an account then and there stated between them." The count would support an action in assumpsit. By the same token, would it not base a defense?

[3] The argument for the plaintiff proceeds upon the assumption that the law declares the measure of fair compensation to be the price at which the coal could have been sold abroad. For this there are cited the cases of Buehler v. Fashion Plate Co., 269 Pa. 428, 112 Atl. 632; Sugar Co. v. Hanscom, 273 Pa. 98, 116 Atl. 140; Overdorff v. Boyer, 275 Pa. 294, 119 Atl. 408. No one of these cases, nor all of them, "conclusively settle" the question. What is the measure of damages, or of fair compensation, is a variable, not a constant. Market price, or market value, as it is called, is one. Ordinarily it is the best, and in consequence the only, measure which will be applied. Who would call the hectic offerings of stressful times in a war evidence of market values? The government could at any time declare an embargo, and to all intents and purposes had done so in the present instance. Of what value under such circumstances is the contract of a foreign purchaser? If the law prohibits sales at more than a fixed price, how can the law declare a higher price to be a fair one? Justice should at all times be done, but, if it turns upon a fair price, what is fair cannot always be easily determined.

There was, then, good reason, every inducement, and an undoubted consideration for an agreement upon what fair compensation was. The agreement brought to the plaintiff nearly $1,000,000 in cash money. Why is the plaintiff not held to it? Such agreements are so common that they must be deemed to have a greater binding force than the mere willingness of the parties to abide by them. It cannot be said they are not binding merely because the courts have held time out of mind that a creditor is not bound to accept from his debtor less than what is due because without consideration he has so agreed. Agreements, such as the present, are not agreements to accept less than what is due, but are agreements upon what is due; the consideration to each being that they get more by the agreement than they might otherwise get and have reduced an uncertainty to a certainty. If such contracts are without consideration, then no contracts, except upon a quantum meruit, have a consideration. There was another consideration. The plaintiff was concerned to have his claim made definite. There was doubt whether its coal was taken without any legal sanction (as was not uncommon) or under the power of eminent domain, and whether it was taken by the Director General of Railroads or by the Fuel Administrator. There was uncertainty, also, in the measure of compensation. The agreement reduced what the

plaintiff was to have to a practical certainty. If the doctrine was based upon some policy of the law, as, for illustration, agreement to arbitrate, the interpretation which the plaintiff gives to it could be accepted. It is based, however, wholly upon the absence of a consideration. In point of fact, the doctrine of accord and satisfaction was evolved to uphold agreements of settlement; the satisfaction supplying the want of a consideration. It gives no aid to the repudiation of an agreement fairly made.

It is a plausible thing to say that the government should pay what other purchasers would be compelled to pay. It is impossible to have a law of general application which does not hurt some one. If embargoes and price fixing does injustice to any one, it is to be regretted; but it is none the less to be regretted to have the public and the public treasury held to the payment of extortionate prices.

We do not accept of the characterization of this agreement as unfair. To the coal in clause 1 a profit of over $175,000 was allotted. The coal in clause 2 is not the subject of complaint, and for the nearly 50,000 tons in clause 3 the plaintiff was given all it asked. It is by no means clear that the plaintiff did not fare better under the agreement than it would have done under the award of the law.

Our conclusion is that the plaintiff should have judgment for a sum calculated upon the basis of the Underwood agreement. The parties will doubtless be able to agree upon the figures, and judgment will be entered accordingly. If they are not, judgment will be entered by the court, jurisdiction of the cause being retained for this purpose. Exceptions are allowed to the respective parties.